**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

CHANDRA BALDERSON, et al.,

                     Plaintiffs,

v.                                 CIVIL ACTION NO.   2:19-cv-00666

LINCARE INC.,

                     Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Defendant Lincare Inc.'s ("Defendant") Motion for Summary Judgment, (ECF No. 84), Defendant's Motion for Partial Summary Judgment, (ECF No. 86), and Plaintiff Chandra Balderson's ("Plaintiff") Motion for Partial Summary Judgment, (ECF No. 88). For the reasons discussed more fully below, Defendant's Motion for Summary Judgment, (ECF No. 86), is **DENIED IN PART** and **GRANTED IN PART**. Further, and for the reasons explained more fully below, Defendant's Motion for Partial Summary Judgment, (ECF No. 86), is **DENIED**. Finally, and again for the reasons more fully explained below, Plaintiff's Motion for Partial Summary Judgment, (ECF No. 88), is **DENIED AS MOOT**.

*I.   BACKGROUND*

This action arises out of the alleged wrongful termination of Plaintiff's employment by her employer, Defendant Lincare Inc.  Defendant is a supplier of respiratory care services and equipment for home use.  (ECF No. 85 at 1.)  Plaintiff is a former sales representative who was

hired by Defendant in November 2015 at Defendant's Parkersburg, West Virginia location.   (ECF Nos. 85 at 1; 94 at 2.)

   A. *Plaintiff's Employment Responsibilities and Defendant's Operations*

      As a sales representative, Plaintiff had the responsibility of making sales calls each week to Defendant's referral sources, establishing and maintaining relationships with those referral sources, preparing sales plans, and understanding insurance and billing procedures.   (ECF No. 85 at 1.)   Plaintiff was eligible for earning a commission when she completed a "sale," which meant that an order for service or equipment was placed by a physician and other certain requirements were satisfied.   (*Id.* at 2.)   The commission was to be paid in accordance with Defendant's "Commission Structure for Commissioned Sales Representatives"   (the "Commission Structure").   (*Id.*)   Upon her hiring, Plaintiff read and signed the Commission Structure, thereby indicating her understanding of and agreement to it.   (*Id.*)   The Commission Structure established, in pertinent part, as follows:

> [N]o commission shall be deemed earned by, or will be payable to, any Sales Representative for any patient set-ups which are found (based on the reasonable judgment of the Corporate Compliance Officer) to be in violation of Lincare's Compliance Program . . . if the Sales Representative had personal knowledge of the violation and failed to report it to the Corporate Compliance Officer.

(*Id.*)   Plaintiff was the only sales representative at Defendant's Parkersburg location who was eligible to receive commissions.   (*Id.*)

      As a supplier of respiratory care services and equipment, Defendant is subject to both federal and state statutory and regulatory standards.   (*See* ECF No. 84-6 at 2.)   To foster compliance with these standards, Defendant has implemented a "Corporate Compliance Program" (the "Compliance Program") that imposes duties on its employees that are more expansive and

comprehensive than any specific statutory or regulatory requirement.   (*See generally id.*; ECF No. 85 at 2.)   The Compliance Program encompasses various policies and procedures, including a code of conduct, training modules, and portions of the employee handbook.   (ECF No. 85 at 3.) Defendant's Chief Compliance Officer is responsible for investigating any potential compliance violations.   (*Id.*)

Among these policies, the Compliance Program specifically prohibits employees from "offering or giving valuable property, equipment, services, gifts or other benefits to a person in exchange for the referral of patients to the Company."   (ECF No. 84-7 at 2.)   The Compliance Program also prohibits employees from "misrepresenting a diagnosis for the patient to justify the services or equipment furnished[.]"   (ECF No. 85 at 3.)   Similarly, the Compliance Program requires employees to submit proposed marketing materials to Defendant's Marketing Department for approval, as the creation and distribution of the employee's own marketing material is prohibited.   (*Id.*)   These various policies all work in tandem to ensure compliance with health care laws, and violation of the Compliance Program could lead to issues with the Anti-Kickback Statute and the False Claims Act.   (*Id.*)

Ventilators, which Plaintiff marketed for Defendant, may be covered by Medicare when certain criteria are met.   (*Id.*)   The material given to physicians explain that when ordering a ventilator for in-home use, the physician should include chart notes with their orders that establish why the ventilator is medically necessary for a specific patient, such as the qualifying diagnosis, the severity of the diagnosis, the planned course of treatment, and results from other prescribed therapies.   (*Id.* at 4.)   If the physician believes an in-home ventilator is needed, but the patient

does not qualify for Medicare coverage, the patient may bear responsibility for paying for the equipment.  (*Id.*)

B.  *The Audit and Termination of Plaintiff's Employment*

Defendant conducts regular audits of documents submitted which establish medical necessity for ventilator orders prior to submitting those orders to Medicare or other insurers.  (*Id.* at 4; ECF No. 94 at 2.)  During one of these audits in the Parkersburg location, Defendant identified "questionable documentation," consisting of handwritten "template" notes that were "the exact sane cloned type of note" and appeared in multiple patients' orders.  (ECF No. 85 at 4.)  While certain information differed in these notes, such as the physician's signature, patient identification information, and dates, the body of each note "contained nearly identical statements of medical necessity."  (ECF No. 94 at 2.)  The results of the audit were reported to Sandra Moreau ("Moreau"), Lincare's Healthcare Services Manager, and Jennifer Pedersen ("Pederson"), Chief Compliance Officer, who began an investigation.  (*Id.*; ECF No 85 at 4.)

On June 3, 2019, Moreau and Pederson, along with Defendant's Senior Corporation Counsel Sheila Kalteux ("Kalteux"), traveled to the Parkersburg location to investigate the findings of the audit.  (ECF No. 85 at 4.)  Once there, the trio interviewed Chad Brady ("Brady"), the manager of the Parkersburg location and Plaintiff's supervisor; Plaintiff; and several other Parkersburg employees.  (*Id.*)  During this investigation, Plaintiff provided Moreau, Pederson, and Kalteux with a binder that contained copies of two "template notes," with "handwritten template language for ventilator orders" from two different doctor's offices.  (*Id.*; ECF No. 94 at 3; *see generally* ECF No. 94-1.)  The template notes did not contain any patient information or signatures, but rather only a generic statement of medical necessity.  (*See generally* ECF No. 94-

1.)   These template notes matched the handwritten notes Defendant discovered during the audit that triggered the investigation.   (ECF No. 85 at 5.)   Based on the findings of the investigation, Pederson terminated Plaintiff's employment for violations of the Compliance Program.   (*Id.*)

These template notes, which contained nearly identical statements of medical necessity, were in fact created by the respective physicians' offices under the supervision of the physician. (ECF No. 94 at 3; ECF No. 94-3 at 4; ECF No. 94-4 at 4.)   Ventilator orders require statements of medical necessity, and, because the statements are largely the same for patients who require ventilators, the physicians would then use these template notes to streamline patient care.   (ECF No. 94-4 at 4.)   While the physicians had copies of these templates at their respective offices, Plaintiff would keep additional copies in the event the physician or the office staff needed one. (*Id.*)   The physician would fill out the missing information and review the language to ensure that the note would be specific to that patient when submitting an order.   (ECF No. 94-3 at 7–8.)

Defendant's investigation also revealed that Brady, the Parkersburg location manager, had also "violated Lincare's policies as they pertain to the Healthcare laws and regulations."   (ECF No. 94-5.)   Specifically, Brady had been found to have written "information on a fax to a physician that could be considered coaching or leading information."   (*Id.*)   The information Brady provided to physicians was an unapproved document titled "Good Chart Notes Examples," which provided examples for the physicians of acceptable patient notes for a ventilator order. (ECF No. 94 at 4; ECF No. 94-6.)   Furthermore, Brady was found to have provided "free equipment," which constituted a potential violation of the Anti-Kickback Statute.   (ECF No. 94-5; ECF No. 94-7 at 6.)   As a result of these violations of the Compliance Program, Defendant issued Brady a final written warning.   (ECF No. 84-17.)

Following Plaintiff's discharge from employment, Defendant then failed to pay Plaintiff her final wages due and owing to her at the time of her discharge.   (ECF No. 89 at 1.)   Defendant, acknowledging its error, issued Plaintiff two checks in December 2019.   (ECF No. 88-2; ECF No. 84-13.)   The checks included one for $701.64 in gross wages, minus applicable withholdings, that was owed to Plaintiff at the time of her discharge, as well as another for Plaintiff's liquidated damages, which totaled $1,470.20.   (ECF No. 84-13.)   Defendant also stated that it was "prepared and willing to pay your reasonable attorney's fees" for this specific issue.   (*Id.* at 1.) Plaintiff states, however, that "the check was not cashed and the amounts remain owing."   (ECF No. 89 at 2.)

### C. *Procedural History*

On August 12, 2019, Plaintiff initiated this action in the Circuit Court of Wood County, West Virginia.   (ECF No. 1-1.)   Defendant then removed this action to this Court on September 16, 2019, based on diversity jurisdiction pursuant to 28 U.S.C. § 1332.   (ECF No. 1.)   Pursuant to an order by the Court, Plaintiff filed an amended complaint on January 15, 2020.   (ECF No. 46.)   Defendant filed its answer to the amended complaint on January 29, 2020.   (ECF No. 49.) Then, on February 7, 2020, Defendant filed a motion for summary judgment, in which Defendant argued that Plaintiff's pre-employment waivers of her right to a jury trial and her right to bring a class action were enforceable.   (ECF No. 51.)   Thereafter, Plaintiff and Defendant jointly stipulated that Plaintiff would voluntarily dismiss the putative class action and strike the demand for a jury trial, thereby mooting Defendant's motion.   (ECF No. 55.)   Plaintiff then filed her second amended complaint, as directed by the Court, on February 26, 2020.   (ECF No. 58.)

Plaintiff's second amended complaint alleges four causes of action.   First, in Count I, Plaintiff alleges that Defendant violated the Patient Safety Act ("PSA"), W. Va. Code § 16-39-1, et seq.   (*Id.* at 4.)   In Count II, Plaintiff alleges that Defendant violated the West Virginia Human Rights Act, W. Va. Code § 5-11-9.   (*Id.* at 5.)   Then, in Count III, Plaintiff alleges that Defendant violated the Wage Payment and Collection Act, W. Va. Code § 21-5-1, et seq., by failing to pay her wages, commissions, and reimbursements that were due to her at the time of her termination. (*Id.*)   Finally, Count IV also alleges violations of the Wage Payment and Collection Act for Defendant's alleged failure to pay Plaintiff commissions that were due and owing at the time of her discharge.   (*Id.* at 6.)

Defendant has filed two motions for summary judgment.   Defendant's first motion for summary judgment was filed on August 10, 2020.   (ECF No. 84.)   Plaintiff filed her response in opposition on August 24, 2020.   (ECF No. 94.)   Defendant then filed its reply on August 31, 2020.   (ECF No. 99.)   Defendant's second motion is for partial summary judgment.   Defendant filed this motion on August 10, 2020.   (ECF No. 86.)   Plaintiff filed her response in opposition on August 24, 2020.   (ECF No. 95.)   Defendant then filed its reply on August 31, 2020.   (ECF No. 98.)

Plaintiff filed her motion for partial summary judgment on August 10, 2020.   (ECF No. 88.)   Defendant filed its response in opposition on August 24, 2020.   (ECF No. 93.)   Plaintiff did not file a reply.

With the briefing on these competing motions complete, the motions are now ripe for adjudication.

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. It states, in pertinent part, that a court should grant summary judgment if "there is no genuine issue as to any material fact."  "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."  *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).  Summary judgment should not be granted if there are factual issues that reasonably may be resolved in favor of either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

The nonmoving party bears the burden of showing there is a "genuine issue of material fact for trial ... by offering 'sufficient proof in the form of admissible evidence[.]'"  *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  When ruling on a motion for summary judgment, the Court must view the evidence "in the light most favorable to the opposing party."  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## III.    DISCUSSION

Because of the competing nature of these motions, the Court will address each in the order presented.

8

### A. Lincare Inc.'s Motion for Summary Judgment

Defendant's first motion for summary judgment argues for judgment in Defendant's favor because Plaintiff was not subjected to retaliation for any conduct protected by the Patient Safety Act; Plaintiff was not discriminated against on account of her sex; and Plaintiff is not entitled to any further relief under the Wage Payment and Collection Act. Plaintiff, in her response, concedes her claim under the Patient Safety Act (Count I) and her claim for unpaid commissions under the Wage Payment and Collection Act (Count IV). Therefore, Defendant's motion is hereby **GRANTED** as to Plaintiff's claims under the Patient Safety Act (Count I) and for commissions due under the Wage Payment and Collection Act (Count IV).

Plaintiff's concessions mean that only Counts II and III remain, and, because Plaintiff's remaining claim under the Wage Payment and Collection Act is the subject of her motion for partial summary judgment, the Court will address Count III when it takes up Plaintiff's motion. Therefore, the Court begins its analysis of Defendant's motion as to Count II, violation of the West Virginia Human Rights Act.

### 1. Establishing a Prima Facie Case under the McDonnell-Douglas Framework

Defendant argues that Plaintiff is unable to show that but for the fact that Plaintiff is female, she would not have been fired. (ECF No. 84 at 16.) In support of this argument, Defendant points to the fact that the decisionmaker in this instance, Chief Compliance Officer Pederson, is also female. (*Id.*) Defendant argues that any possible inference of discrimination is further undermined by the fact that Plaintiff's position was replaced by a female. (*Id.*) Finally, Defendant argues that Brady—who received a final written warning for his violations of the

Compliance Program—is not an individual who is similarly-situated to Plaintiff, thus rendering him as an inappropriate comparator for the purposes of her discrimination claim.   (*Id.* at 17–18.)

In response, Plaintiff argues that not only is Brady's alleged misconduct similar to her own, but that Brady himself serves as an appropriate comparator for her discrimination claim.   (ECF No. 94 at 9–10.)   In particular, Plaintiff notes that she and Brady were only "one step removed," and that in many instances, their job responsibilities overlapped.   (*Id.* at 10–11.)   Plaintiff further argues that Defendant's "'Same Group' Theory" has been explicitly rejected by the Supreme Court of the United States.   (*Id.* at 11.)   Finally, Plaintiff argues that Defendant's reason for termination was pretextual because, despite its alleged concern of Plaintiff's violations, it never reported any known or suspected violation to the Office of Inspector General.   (*Id.* at 13.)

Under the West Virginia Human Rights Act, it is unlawful "[f]or any employer to discriminate against an individual with respect to . . . tenure . . . if the individual is able and competent to perform the services required . . . ."  W. Va. Code § 5-11-9(a)(1).   "Discriminate" means "to exclude from, or fail or refuse to extend to, a person equal opportunities" based on several protected classes, including sex.  W. Va. Code § 5-11-3(h).   The West Virginia Supreme Court of Appeals has held that an employment discrimination claim under the Human Rights Act is governed by the same analytic framework of Title VII of the Civil Rights Act of 1964, as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).   *See Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152, 159 (W. Va. 1995); *Calef v. FedEx Ground Packaging Sys., Inc.*, 343 F. App'x 891, 898 (4th Cir. 2009).

Under the burden-shifting *McDonnel-Douglas* framework, the plaintiff must first establish a prima facie case of employment discrimination.   *See Knotts v. Grafton City Hosp.*, 786 S.E.2d

188, 194 (W. Va. 2016).   The plaintiff may carry this burden by establishing: "(1) that she is a member of a protected class; (2) that the employer made an adverse decision concerning her; and (3) that but for the plaintiff's protected status, the adverse decision would not have been made."   *Reese v. CAMC Mem'l Hosp., Inc.*, No. 2:09-cv-00223, 2010 WL 2901627, at *4 (S.D. W. Va. 2010) (citing *Mayflower Vehicle Systems, Inc. v. Cheeks*, 629 S.E.2d 762, 772–73 (W. Va. 2006)).   Similarly, in a disparate treatment case, a plaintiff may meet the initial prima facie standard by showing the following:

> (1) that the complainant is a member of a group protected by the Act; (2) that the complainant was discharged, or forced to resign, from employment; and (3) that a nonmember of the protected group was not disciplined, or was disciplined less severely, than the complainant, though both engaged in similar conduct.

*Barefoot*, 457 S.E.2d at 162–63 (quoting Syl. Pt. 2, *State ex rel. State of West Virginia Human Rights Comm'n v. Logan-Mingo Area Mental Health Agency, Inc.*, 329 S.E.2d 77, 79 (W. Va. 1985)).

If the plaintiff can make out these elements, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment decision.   *See Charleston Town Ctr. Co., LP v. W. Va. Human Rights Comm'n*, 688 S.E.2d 915, 920 (W. Va. 2009).   "The reason need not be a particularly good one. It need not be one which the judge or jury would have acted upon. The reason can be any other reason except that the plaintiff was a member of a protected class."   *Conway v. E. Assoc. Coal Corp.*, 358 S.E.2d 423, 430 (W. Va. 1986). If the proffered reason is nondiscriminatory, then the plaintiff regains the burden of showing by a preponderance of the evidence that the articulated reason is a mere pretext for the actual, discriminatory motive.   *See Charleston Town Ctr. Co., LP*, 688 S.E.2d at 920–21.

11

Here, Plaintiff advances a theory of sex discrimination based on disparate treatment. Plaintiff presumably satisfies the first two elements easily: She is female, and she was discharged from her employment.   The third element, as argued by the parties, is less clear.   Plaintiff has made an initial showing that Brady, a male co-worker, received only a written warning for arguably similar conduct.   (ECF No. 84-17.)   Standing alone, this would be sufficient to establish a prima facie case of discrimination.   *See Barefoot*, 457 S.E.2d at 162–63. However, both parties present disputes over material facts that render summary judgment on this issue inappropriate.

First, Defendant argues that it is entitled to inferences of non-discrimination based on the fact that the ultimate decisionmaker, Pederson, is also female.   Because Pederson was the individual who determined that Plaintiff's employment should be terminated, Defendant argues that there cannot be any discrimination.   (ECF No. 99 at 3.)   Relatedly, Defendant urges that there cannot be any discrimination because Plaintiff's replacement was also female.   (*Id.*)   While Defendant is correct that, at least in the Fourth Circuit, evidence that decision-makers were in the same protected class as plaintiff creates an inference against discrimination, this only serves to undermine Plaintiff's claim, not refute it completely.   *See, e.g.*, *McNeal v. Montgomery County, Md.*, 307 Fed. App'x 766, 775 (4th Cir. 2009) ("Courts have held that the fact that the relevant party is the same age or older than the plaintiff is circumstantial evidence against age discrimination.")   Further, and as to the latter point, Plaintiff asserts that while Pederson terminated her, it was Brady who hired her replacement.   (ECF No. 94-12 at 10–11.) Simply, while the Court considers these points, each introduces an issue of fact upon that precludes summary judgment.

Further, and as to Brady, the general fact remains that Plaintiff has made the intitial showing that "that a nonmember of the protected group" was "disciplined less severely[] than the complainant," despite engaging in similar conduct.  *See Barefoot*, 457 S.E.2d at 162–63.  Yet, Defendant argues that Brady cannot serve as an appropriate comparator because of both the conduct he was disciplined for and his position within the company.  (ECF No. 85 at 17–18.) Here too, though, the Court is faced with issues of fact that render the granting of summary judgment inappropriate.  For example, Defendant argues extensively that Brady faxing "good chart note examples" to physicians to use for their orders is far less egregious than one fax sent by Plaintiff in which Defendant argues Plaintiff inappropriately directed the physician to include certain information in the patient's medical file.  (ECF No. 99 at 5–6.)  Plaintiff argues, however, that she made no such directive, but rather only stated that specific information was needed to complete the order.  (ECF No. 94 at 9.)  No doubt this fact is material: This conduct was what led to each employee's discipline.  But such a battle of semantics—that is, whether an example is the same as a template, (*see* ECF No. 94 at 8; ECF No. 99 at 6–7)—renders summary judgment inappropriate.

Similarly, Defendant argues that Brady is still an inappropriate comparator because of his job title, that being manager of the Parkersburg location.  (ECF No. 85 at 17.)  In response, however, Plaintiff has pointed to a number of similarities and overlaps between her position and that of the manager that the Court believes relevant to this analysis.  (ECF No. 94 at 10.)  The Court is cognizant of the fact that Brady was Plaintiff's immediate supervisor, which would normally weigh against Brady as an appropriate comparator, but the Court believes there to be such overlap in the duties actually performed that led to the discipline that judgment would again

be inappropriate on this point.   In this case, the conduct of Brady and Plaintiff, their performance of specific duties at the time of the asserted misconduct, and the policies both employees were subject to appear to be quite similar.   *See, e.g.*, *Molloy v. Blanchard*, 115 F.3d 86, 91 (1st Cir. 1997) ("The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.")   *See also E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007) ("Individuals are considered 'similarly-situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'")   While Defendant maintains that Plaintiff actually directed a physician to use the language from her "template," Brady himself was disciplined for providing information to a physician "that could be considered coaching or leading information" when he faxed "examples" of appropriate patient progress notes to be included with a ventilator order.   (ECF No. 94-5; ECF No. 94-6.)   In this respect, both Brady and Plaintiff procured copies of acceptable language for physicians to include in ventilator orders, (*compare* ECF No. 94-1 *with* ECF No. 94-6), both communicated these copies to physicians, (ECF 84-12; ECF No. 94-5), and both were disciplined for it, but only Plaintiff was discharged.   Whatever difference there may be in the two employees' behavior, Plaintiff has successfully shown that this material fact remains in dispute.

Based on the foregoing, Defendant has failed to show that there are no genuine issues of material fact regarding Plaintiff's prima facie case of discrimination.   And while the Court cannot definitively conclude at this juncture that Plaintiff has established a prima facie case of discrimination because of the above disputed material facts, the Court nonetheless concludes that Plaintiff could so succeed.   *See, e.g.*, *Fox v. Leland Volunteer Fire/Rescue Dept., Inc.*, 648 Fed.

App'x 290, 294 (4th Cir. 2016).   With this assumption in hand, the Court thus proceeds to the second and third steps of the *McDonnell-Douglas* framework to address the parties' remaining arguments.

> 2.   *Legitimate, Non-Discriminatory Reason for Discharge and Pretext*

At this stage in the analysis, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's discharge from employment.   *Charleston Town Ctr. Co., LP*, 688 S.E.2d at 920.   On this point, Defendant has articulated such a reason: Plaintiff's violations of the Defendant's Compliance Program.   (*See* ECF No. 85 at 13; ECF No. 94-2.)   With Defendant's legitimate and non-discriminatory reason articulated, the burden returns to Plaintiff to establish that this reason is mere pretext for discrimination.   *Charleston Town Ctr. Co., LP*, 688 S.E.2d at 920.

"Pretext" as it relates to unlawful discriminatory employment practices "means an ostensible reason or motive assigned as a color or cover for the real reason or motive, or false appearance, or pretense."   *Mayflower Vehicle Sys., Inc.*, 629 S.E.2d at 773.   Pretext of this nature may be shown through several forms of evidence: "(1) comparative evidence, (2) statistical evidence, and (3) direct evidence of discrimination, in the form of discriminatory statements and admissions."   *Charleston Town Ctr. Co., LP*, 688 S.E.2d at 921 (quoting *Miles v. M.N.C. Corp.*, 750 F.2d 867, 870 (11th Cir. 1985)).   If a plaintiff can, through direct or circumstantial evidence, show that the employer's nondiscriminatory reason for the employment decision is dishonest and a pretext, then discrimination may be inferred.   *See Mayflower Vehicle Sys., Inc.*, 629 S.E.2d at 773 (citing *Barefoot*, 457 S.E.2d at 156).

On this point, Plaintiff argues that Defendant's actions following Plaintiff's discharge, and its explanations for them, are not credible, which would lead a trier of fact to doubt the sincerity of the proffered reason.   (ECF No. 94 at 12–13.)   In support of this argument, Plaintiff argues that Pederson, Defendant's Chief Compliance Officer, "testified unequivocally" that Plaintiff had violated federal healthcare laws, including the False Claims Act and the Anti-Kickback Statute. (*Id.*; ECF No. 94-7 at 4.)   Pursuant to a Corporate Integrity Agreement with the OIG, Defendant was required to self-report any probable or actual "violation of criminal, civil, or administrative laws applicable to any Federal health care program[.]"   (ECF No. 94-13 at 11–12.)   Because Defendant did not report Plaintiff's "unequivocal" violation of federal laws as it was obligated, Plaintiff argues that the trier of fact could reasonably infer that Defendant's reason for termination was merely pretextual.   (ECF No. 94 at 13.)   Plaintiff further argues that Defendant's subsequent amendments to its Rule 30(b)(6) testimony through an errata sheet only adds to the inference, as the original transcript remains a part of the record and may be used to impeach the Rule 30(b)(6) deponent at trial.   (*Id.* at 14.)

The Court is in agreement for purposes of this motion.   Plaintiff has successfully showed that genuine issues of material fact remain as to the issue of pretext.   *See, e.g.*, *Wesley v. Arlington County*, 354 Fed App'x 775, 782 (4th Cir. 2009).   This finding does not conclude that discrimination occurred, but only that a reasonable trier of fact could conclude that it did.   *See id.* at 782, n.9 ("[W]e must similarly not invade the province of the [trier of fact] and weigh the credibility of witnesses and evidence on contested issues of fact. We make no ultimate judgment on whether the reasons offered by the [defendant] are pretextual. Instead, reviewing the limited and contradictory evidence in the record in the light most favorable to [the plaintiff], we only hold

16

that a reasonable [trier of fact] could reach such a conclusion.")   Because Defendant has failed to show that there are no genuine issues of material fact, Defendant's motion is **DENIED** as to Count II of Plaintiff's second amended complaint.

### B. Lincare, Inc.'s Motion for Partial Summary Judgment[1]

Defendant's next motion for summary judgment is related to economic damages only. (ECF No. 86.)   Defendant asserts that Plaintiff provided "false or misleading information" on her application for employment regarding her respiratory therapist license in the state of Ohio.   (ECF No. 87 at 2.)   Specifically, Defendant argues that Plaintiff failed to disclose that her license was subject to a one-year probationary period as the result of failing to disclose to the Ohio Respiratory Care Board that she had pled guilty to public intoxication at some point in her past.   (*Id.* at 1.) Defendant states that providing false or misleading information is a terminable offense, and that, if it had known, Defendant would have terminated Plaintiff's employment on this fact alone.   (*Id.* at 5.)

Plaintiff conversely argues that Defendant must demonstrate not only that it could have terminated her employment for providing false information, but that it would have terminated her employment.   (ECF No. 95 at 1.)   Relatedly, Plaintiff argues that, pursuant to the after-acquired evidence doctrine, Defendant must show "serious wrongdoing."   (*Id.* at 3–4.)   In light of this standard, Plaintiff argues that it is unclear whether disclosure was even required by the terms of

---

[1] This is Defendant's second motion for summary judgment, filed simultaneously with the first.   (*See* ECF Nos. 84, 86.)   The Local Rules of Procedure for the United States District Court for the Southern District of West Virginia, Rule 7.1 establishes that accompanying memoranda of law shall not exceed 20 pages in length.   Defendant has filed separate motions for summary judgment that, in effect, address every issue in the present action and, in total, exceed 20 pages.   By filing these separate motions for summary judgment, Defendant has evaded the spirit of Rule 7.1.   As will be explained more thoroughly in this opinion, it is of no consequence to the Court's adjudication of the issues raised.   Counsel is cautioned, however, to abide by the Local Rules, in both letter and spirit, for any and all future litigation before this Court.

Defendant's application and that the omission itself was "wholly inconsequential" to Defendant's decision to hire Plaintiff.   (*Id.*)   Plaintiff asserts that, based on the foregoing, a genuine issue of material fact exists such that summary judgment is inappropriate on this issue.   (*Id.* at 7.)

The after-acquired evidence doctrine concerns the effect of evidence of employee misconduct acquired by the employer after the employee's termination.   *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362–63 (1995); *see Barlow v. Hester Indus., Inc.*, 479 S.E.2d 628, 643 (W. Va. 1996) ("However, we caution that such evidence is admissible only for the limited purpose of determining the remedies available to the plaintiff employee.").   "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would  have been terminated on those grounds alone if the employer had known of it at the time of the discharge."   *McKennon*, 513 U.S. at 363.   *See also Russell v. Microdyne Corp.*, 65 F.3d 1229, 1240 (4th Cir. 1995) (recognizing the "emphasis on the need for serious wrongdoing" in light of *McKennon*).   "Where the employee's misconduct consists of resume fraud, the after-acquired evidence doctrine affords an employer a defense if the employer would not have hired the employee if it had known of the fraud." *Schiavello v. Delmarva Systems Corp.*, 61 F.Supp.2d 110, 113 (D. Del. 1999) (quoting *Crawford Rehabilitation Servs. Inc. v. Weissman,* 938 P.2d 540, 547 (Colo.1997)). When properly applied, the doctrine renders front pay inappropriate and dictates that back pay shall be calculated from the date of the unlawful discharge to the date the new information was discovered.   *See id.* at 361-62.

Here, there can be no serious dispute that Plaintiff provided "false or misleading information" on her application: In fact, Plaintiff admits as much.   (ECF No. 95 at 2.)   However, there is a genuine dispute of a material fact as to how serious this violation was and whether

Defendant would have chosen to not hire or terminate Plaintiff had it known of the omission earlier.   Specifically, Defendant has essentially admitted that a respiratory therapist license is not necessary for the sales representative position.   (ECF No. 95-3 at 4; ECF No. 95-4 at 3–4.)   Of particular note is Mr. Brady's testimony that the fact that Plaintiff possessed a respiratory therapy license was not considered in her hiring.   (ECF No. 95-3 at 4.)   Furthermore, Defendant's corporate representative could not state with any certainty that the omission was disqualifying or whether the probationary period had any impact on Defendant's operations or Plaintiff's performance.   (ECF No. 95-4 at 3–4, 5 ("I think [knowledge of the probationary period] would have caused further consultation on the topic of the credentials.")

Furthermore, it is unclear whether disclosure of this offense was technically required pursuant to Defendant's application process.   While the Court does not speculate on "best practices" of disclosure for job applications, Defendant's application asks for "current" restrictions or disciplinary actions against such licenses.   (ECF No. 95-1 at 2.)   Whether a one-year probationary period—which arguably does not affect the license itself, but only future misconduct—is a "current" disciplinary action is not clear.   Simply, the imposition of a probationary period did not affect the license or Plaintiff's ability to practice under such license; instead it could only potentially affect the license if some future misconduct occurred.   (*See* ECF No. 95-2 at 1–2 ("The BOARD is empowered . . . to revoke, or suspend a license, refuse to issue or renew a license, or impose a fine, reprimand, or place on probation the holder of a license . . . .")   As this language makes clear, the imposition of a probationary period is not against the *license*, but against the *holder of a license*.   (*Id.*)   Whether that imposition *should* be disclosed is an entirely different question, and one that this Court cannot and does not answer.

19

Defendant's motion for partial summary judgment only addresses economic damages, and on that note, Plaintiff has identified genuine issues of material fact that prevent this Court from granting judgment in favor of Defendant.   Therefore, based on the foregoing, Defendant's motion for partial summary judgment, (ECF No. 86), is **DENIED**.

### C.  Plaintiff's Motion for Summary Judgment

The Court finally takes up Plaintiff's motion for summary judgment, (ECF No. 88), the resolution of which will necessarily resolve the remainder of Defendant's first motion as to Count III.  (*See* ECF No. 84.)   In her motion, Plaintiff argues that she is entitled to summary judgment in her favor as to her remaining claim under the West Virginia Wage Payment and Collection Act because Defendant has admitted to failing to pay her the wages due and owing to her at the time of her termination.  (ECF No. 89 at 1.)   Plaintiff argues that she is entitled to $701.64 in gross wages and $1,403.28 in liquidated damages pursuant to W. Va. Code § 21-5-4.  (*Id.* at 2.) Plaintiff finally requests reasonable attorneys' fees and expenses pursuant to W. Va. Code § 21-5-12(b).  (*Id.* at 3.)

Defendant responds that Plaintiff's claim under the Wage Payment and Collection Act is moot because Defendant has already issued her a check for her final wages and liquidated damages, plus interest.  (ECF No. 93 at 1.)   Therefore, Defendant argues that this Court lacks subject-matter jurisdiction over this claim, and that it should be dismissed.   (*Id.*)

The Court agrees with Defendant that this claim is now moot.   Defendant issued the full relief sought by Plaintiff by issuing her a check for the full amount of her wages due plus liquidated damages and interest pursuant to W. Va. Code § 21-5-4., thereby extinguishing any current controversy.  *See Horner v. ELM Locating & Util. Servs.*, No. 13-1168, 2014 WL 7231654, at *1

(C.D. Ill. Dec. 16, 2014) (finding that the plaintiff's claim for unpaid wages was moot because the plaintiff had received payment in full of the remedy sought and dismissing the claim due to lack of subject matter jurisdiction); *Williams-Green v. J. Alexander's Rests., Inc.*, 277 F.R.D. 374, 380 (N.D. Ill. 2011) (finding that, because the plaintiff had received the overtime wages plus interest due under the Illinois Wage Payment and Collection Act, the plaintiff's claim was moot and dismissing the claim for lack of subject matter jurisdiction).

The Court's finding does not affect Plaintiff's claim for reasonable attorneys' fees and expenses, however.   *See Dolly v. United Disposal Serv., Inc.*, No. 18-1075, 2020 WL 1674254, at *4 (W. Va. Apr. 6, 2020) (memorandum decision) (upholding finding that petitioner was precluded from receiving attorney's fees incurred after receipt of respondent's correspondence intended to wholly compensate petitioner for WPCA claim).   "An employee who succeeds in enforcing a claim under W. Va. Code Chapter 21, article 5 should ordinarily recover costs, including reasonable attorney fees unless special circumstances render such an award unjust."   *Amick v. C & T Dev. Co.*, 416 S.E.2d 73, 76 (W. Va. 1992).   The Court finds no such special circumstances here.

Therefore, the Court **ORDERS** Plaintiff to submit a claim within 10 days of entry of this order for reasonable attorneys' fees properly incurred solely with regard to this claim prior to Plaintiff's receipt of the checks for wages, liquidated damages, and interest in December 2019.

Plaintiff's motion for partial summary judgment, (ECF No. 88), is **DENIED AS MOOT**. The Court further **GRANTS** Defendant's motion for summary judgment, (ECF No. 84), as to Plaintiff's claim under the Wage Payment and Collection Act.

*IV.    CONCLUSION*

For the reasons more fully explained above, the Court **DENIES IN PART** and **GRANTS IN PART** Defendant Lincare Inc.'s Motion for Summary Judgment.   (ECF No. 84.)   The Court further **DENIES** Defendant Lincare Inc.'s Motion for Partial Summary Judgment.   (ECF No. 86.) Further, the Court **DENIES AS MOOT** Plaintiff Chandra Balderson's Motion for Partial Summary Judgment. (ECF No. 88.)   Finally, the Court **ORDERS** Plaintiff to submit a claim within 10 days of entry of this order for reasonable attorneys' fees properly incurred prior to Plaintiff's receipt of the checks for wages, liquidated damages, and interest in December 2019.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        October 13, 2020

THOMAS E. JOHNSTON, CHIEF JUDGE