**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

CHANDRA BALDERSON, et al.,

               Plaintiffs,

v.                                  CIVIL ACTION NO.   2:19-cv-00666

LINCARE INC.,

               Defendant.

**MEMORANDUM OPINION AND**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Chandra Balderson ("Ms. Balderson") brings this wrongful termination action under the West Virginia Human Rights Act ("HRA"), W. Va. Code § 5-11-1, *et seq*.   Plaintiff alleges that Defendant Lincare Inc. ("Lincare") unlawfully discriminated against her based on her gender when it terminated her employment on June 3, 2019.

Ms. Balderson filed the Complaint in the Circuit Court of Wood County, West Virginia, on August 12, 2019.   Thereafter, on September 16, Lincare removed the action to this Court on the basis of diversity jurisdiction.   (ECF No. 1.)   The matter was tried to the Court without a jury on October 27 and 28, 2020.   The trial proceeded with Ms. Balderson testifying on her own behalf and calling as witnesses Chad Brady, Jennifer Pederson, Andrea Dagget, and Dr. Clifford Hawley. Lincare, reserving its right to call any of Plaintiff's witnesses, also called Sandra Moreau to testify. Prior to trial, the parties stipulated to the admission of Plaintiff's Exhibits ("Pl. Ex.") 1–28 and Defendant's Exhibits ("Def. Ex.") 1–35, and the exhibits were admitted into evidence.   (*See* ECF

Nos. 133, 134.)   Following trial, the parties submitted written closing arguments for the Court's consideration.   In accordance with Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court now makes its findings of fact and conclusions of law.   Each finding is made by a preponderance of the evidence, unless stated otherwise.

## I.   PRELIMINARY FINDINGS OF FACT

### A.   Ms. Balderson's Employment with and Termination from Lincare

Lincare is a supplier of respiratory therapy products and services. Among other products and services, Lincare sells non-invasive mechanical ventilators to in-home patients.   (ECF No. 46 at ¶ 4.)   Lincare is a national healthcare company with locations—known as "centers"—in 48 states.   (ECF No. 141 at 9, ¶ 2; ECF No. 135 at 76.)   Lincare is based in Clearwater, Florida. One of its centers is in Parkersburg, West Virginia.   (ECF No. 46 at ¶ 2.)

Ms. Balderson began working for Lincare in November of 2015.   (ECF No. 135 at 48.) She was hired as the only sales representative in Lincare's Parkersburg center.   (Def. Ex. 2; ECF No. 135 at 54, 104.)   Chad Brady ("Mr. Brady"), along with his area manager, hired Ms. Balderson.   (ECF No. 135 at 17.)   Before her employment with Lincare, Ms. Balderson had worked for 10 years at the Camden Clark Medical Center and worked as a sales representative and respiratory therapist for Morris Sales, a durable medical equipment company.   (Id. at 46–47.) Ms. Balderson, as evidenced, graduated with a degree in Applied Science in Respiratory Therapy from Washington State Community College in Marietta, Ohio.   (Id. at 46.)

Ms. Balderson was a licensed respiratory care therapist in both Ohio and West Virginia. (Id. at 49.)   Some years before she first applied for her Ohio license, Ms. Balderson had been charged with public intoxication, a misdemeanor.   (Id. at 51.)   Ms. Balderson had been about 21

years old at the time of her arrest.  (*Id.*)  She was required to disclose this to the State Medical Board of Ohio (the "Ohio Board") but neglected to do so because "ten years had passed" and the charge had been "a minor misdemeanor" for which she had only paid a five-dollar fine.  (*Id.* at 52.)  Because she did not disclose this charge to the licensing board, her license was put on probation by way of a Consent Agreement.  (*Id.*)  The Consent Agreement between Ms. Balderson and the Ohio Board established that she would be granted a license, but that Ms. Balderson could not commit any crime or be arrested for one year, and that she would need to obtain a criminal background check within 30 days of the expiration of the consent agreement.[1] (Def. Ex. 20 at 3.)  Beyond the probation period, her license was not restricted in any way, and Ms. Balderson was not prevented from performing any procedure or required any additional supervision.  (ECF No. 135 at 49–50; Def. Ex. 20.)

Prior to her employment with Lincare, Ms. Balderson submitted a written application for employment.  (Pl. Ex. 19.)  On this application, Ms. Balderson disclosed her Ohio and West Virginia respiratory care licenses.  (*Id.* at 2.)  Ms. Balderson, however, checked "No" when prompted to disclose any current restrictions or disciplinary actions on her Ohio license.  (*Id.*)  Ms. Balderson stated her belief that she did not believe there to be any current actions or restrictions against her at the time she submitted her application.  (ECF No. 135 at 49–50.)

Ms. Balderson's job description at Lincare established that she was to "[s]ell[] Lincare services to referral sources, including physicians, discharge planners, and physician office staff" by performing duties which included a) "[e]stablish[ing] and maintain[ing] a relationship with referral sources in the medical community;" b) "[i]dentify[ing] and develop[ing] new referral

---

[1] The Consent Agreement was to be in effect for a period of one year, and it appears to be dated "04/22/2015." (Def. Ex. 20 at 5.)

sources;" c) "[u]understand[ing] and provid[ing] information on Medicare and insurance procedures, pricing information, and product information to referral sources;" and d) "[a]ssist[ing] the center in the assurance of clean paperwork . . . by conducting follow-up visits to physicians to obtain prescriptions for services." (Def. Ex. 2; *see* ECF No. 135 at 91–93.)   For her work, Lincare compensated Ms. Balderson with a salary and commission on her sales.   Ms. Balderson signed a "Commission Structure for Commissioned Sales Representatives," which provided the structure for how she could be eligible for commissions with Lincare ("Commission Structure").   (Def. Ex. 4.)   The Commission Structure, among other things, established that Ms. Balderson was employed at will.   (*Id.*)

At the times relevant to this action, Mr. Brady worked for Lincare as the Parkersburg center manager.   (ECF No. 135 at 14.)   His supervisory responsibilities extended to "Customer Service Representatives, Healthcare Specialists, Sales Representatives, and Service Representatives." (Def. Ex. 3.)    While Mr. Brady was Ms. Balderson's immediate supervisor, Mr. Brady described his professional relationship with Ms. Balderson as "co-workers" and that "there was some overlap" with the tasks they performed.   (*Id.*)   At one point, the two shared an office at the Parkersburg center, and Mr. Brady would visit physicians' offices with Ms. Balderson.   (*Id.* at 15.)   Mr. Brady would also occasionally accept and process orders on Ms. Balderson's behalf, such as might occur when Ms. Balderson was not in the office when an order arrived.   (*Id.* at 16.) Mr. Brady was also subject to the same compliance policies established in Lincare's employee handbook, as the handbook made no distinction between different levels of employees.   (*Id.* at 17.)

4

Lincare adopted a nationwide Corporate Health Care Law Compliance Program and related Code of Conduct to ensure practices throughout the company complied with various healthcare laws and regulations. (Def. Ex. 6; ECF No. 135 at 144–45, 162.) The purpose of these two corporate programs is to aid Lincare employees "in complying with the increasingly complex Health Care Laws by referencing specific written policies and procedures whose compliance is mandatory for . . . employees[.]" (Def. Ex. 6 at 1.) Lincare's Code of Conduct expressly includes the following examples of prohibited conduct: "[m]isrepresenting a diagnosis for the patient to justify the services of equipment furnished" and "[o]ffering or giving valuable property, equipment, services, gifts or other benefits to a person in exchange for the referral of patients to [Lincare]." (Def. Ex. 6.) Pursuant to these programs, Lincare employees, including Ms. Balderson, received annual compliance training. (Def. Ex. 7; ECF No. 135 at 93–95.) The Compliance Program and Code of Conduct are overseen by Jennifer Pedersen ("Ms. Pedersen"), Chief Compliance Officer. (ECF No. 135 at 144.)

At some point in May or June of 2019, Lincare performed a voluntary, internal audit of its Parkersburg center. (*Id.* at 145–46.) During this audit, Lincare discovered certain handwritten progress notes that appeared in multiple patient orders. (*Id.* at 146.) A "progress note" is a part of a medical record where healthcare professionals document a patient's clinical status or achievements during the course of care. (*Id.* at 15–16.) In this case, a progress note would necessarily contain a statement of medical necessity justifying the need for a ventilator. (*Id.* at 16.) The audit revealed that multiple progress notes appeared with substantial similarities in several patients' files. (*Id.* at 146; Def. Ex. 9.) The results of the audit were reported to Sandra

5

Moreau ("Ms. Moreau"), Lincare's Healthcare Services Manager, and Ms. Pedersen, who began an investigation.   (*Id.* at 146.)

One of the investigation-triggering progress notes contained apparently conflicting information.   On May 2, 2019, Ms. Balderson faxed this specific progress note to a physician. (Def. Ex. 12.)   On the cover sheet to the fax, Ms. Balderson wrote, "I need face-to-face notes within the last 6 months that mention her COPD dx and chronic respiratory failure dx."   She also wrote, "I need the attached statement added or the progress note signed, dated and timed with the patient's name and DOB added, also."   Ms. Balderson further wrote "The Trilogy order was missing a few things.   I added.   Just need Dr. ___[2] to sign and date."   (Def. Ex. 12; ECF No. 135 at 65–66.)   However, in the physician's notes from the actual meeting with the patient, the physician indicated that the primary diagnosis was "restrictive ventilatory defect," not COPD or chronic respiratory failure.   (Def. Ex. 12; ECF No. 135 at 110–12.)

At the close of the internal audit, Ms. Moreau, Ms. Pedersen, and Sheila Kalteux, Lincare's Senior Corporation Counsel, traveled to Parkersburg on June 3, 2019, to conduct the subsequent investigation.   (*Id.*)   As a part of the investigation, Ms. Moreau, Ms. Pederson, and Ms. Kalteux interviewed Mr. Brady, Ms. Balderson, and several other Parkersburg employees.   (*Id.* at 179.)

During this investigation, Ms. Balderson provided Ms. Pedersen with progress notes that matched the handwritten notes Lincare uncovered during the audit.   (ECF No. 135 at 179; Pl. Ex. 2.)   Ms. Balderson admitted that she kept these notes in her sales binder.   (Trial Tr. vol 1, 65.) These notes did not contain any patient information or physician signatures, but only a generic statement of medical necessity. (Pl. Exs. 2, 3.)   Ms. Pedersen characterized these progress notes

---

2 The physician's name has been redacted to maintain privacy.   (Def. Ex. 12.)

as "template" or "cloned" progress notes that Medicare administrative carriers "caution physicians,
. . . about not having[.]"   (ECF No. 135 at 180.)   Template or cloned progress notes are typically
the same from patient to patient and are not acceptable "to support medical necessity for a patient."
(*Id.*)

Guidance from the Centers for Medicare and Medicaid Services ("CMS") refer to
templates and cloned notes.   *See* CMS Manual System, Pub. 100-08 Medicare Program Integrity,
Transmittal    455,    Mar.    15,    2013,    https://www.cms.gov/Regulations-and-
Guidance/Guidance/Transmittals/Downloads/R455PI.pdf. [3]   The CMS guidance specifically
states that it "does not prohibit the use of templates to facilitate record-keeping" and that "[a]
physician/[licensed/certified medical professional] may choose any template to assist in
documenting medical information."   *Id.* at 7.   The CMS manual discourages the use of
"predefined answers" because these "limited space templates often fail to capture sufficient
detailed clinical information" to demonstrate that the coverage requirements are met.   *Id.*

The progress notes that Ms. Balderson provided contained "handwritten template language
for ventilator orders" from two different doctor's offices.   (*Id.* at 98–99.)   The notes themselves
were not authored by Ms. Balderson, but instead originated in the respective physicians' offices
under the supervision of the physicians themselves.   (*Id.* at 62–65; ECF No. 139–2 ("Pursley
Dep.") at 7–8.)   While the physicians' offices maintained copies of these progress notes, the
physicians also asked Ms. Balderson to keep copies with her in case the physician needed to place
an order while out of the office, such as when treating a patient in a hospital.   (ECF No. 139–2 at

---

[3] Because publications by government agencies are proper subjects for judicial notice, the Court takes judicial
notice of the Medicare Program Integrity Manual.   *United States ex rel Wall v. Vista Hospice Care*, 778 F.Supp.2d
709, 721 n.63 (N.D. Tex. 2011).

7–8.)   Typically, when making an order, the physician would fill out the missing information and review the language to ensure that the note would be specific to that patient's diagnosis and needs. (*Id.*; ECF No. 139–1 ("Spears Dep.") at 10.)

Ms. Balderson did not author these progress notes.   (ECF No. 135 at 60–61; Pursley Dep. at 41–42.)   The progress notes were used for the physicians' convenience and were never required by Ms. Balderson.   (Pursley Dep. at 22–23, 59; Spears Dep. at 27–28, 42.)   Ms. Balderson likewise never sought to influence a medical opinion or diagnosis, nor did she ever falsify or alter any progress notes.   (Pursley Dep. at 60; Spears Dep. at 42.)

At the end of the investigation on June 3, Ms. Pedersen terminated Ms. Balderson's employment for violations of Lincare's corporate compliance program.   (ECF No. 135 at 147–48.)   Ms. Moreau, Ms. Kalteux, and Mr. Brady were also present for this termination meeting. (*Id.* at 152.)   Ms. Pedersen explained to Ms. Balderson that her employment was terminated for "leading" physicians.   (*Id.* at 22, 27, 58.)   During this meeting, no mention was made of misrepresenting a diagnosis or other misconduct.   (*Id.*)   However, Ms. Pedersen still determined that providing physicians with these progress notes, with language sufficient to support an order and reimbursement for a ventilator, was still a violation of Lincare's Compliance Program because it "is a job of the physician's office . . . and we shouldn't be doing work that should be done by a physician's employee."   (*Id.* at 185.)

Lincare's investigation also revealed that Mr. Brady had provided "coaching" or "leading" information to physicians, along with providing "free equipment."   (Def. Ex. 17; ECF No. 135 at 159.)   Specifically, as to the alleged coaching or leading information, Lincare's investigation revealed that Mr. Brady had sent physicians an unapproved document titled "Good Chart Notes

Examples," which provided language to be used in progress notes for ventilator orders.   (Def. Ex. 13; ECF No. 135 at 72–73.)   Lincare's investigation similarly revealed that physicians were adding Brady's language from these "examples" to patient files in a substantially similar form. (ECF No. 136 at 74–75.)   Unlike Ms. Balderson, though, Mr. Brady's employment was not terminated, and instead he was given a final written warning.    (Def. Ex. 13.)

### B.  Post-Termination

As evidenced, Ms. Balderson was, at the relevant times here, a licensed respiratory therapist.   While employed by Lincare, Ms. Balderson's name badge and business card both displayed the initials "RRT," thus identifying her as a Registered Respiratory Therapist.   (ECF No. 135 at 82–83.)   Despite admitting that ensuring Lincare's clinical employees are properly licensed while employed with Lincare is a duty required of her position, Ms. Moreau was unaware at the time of traveling to Parkersburg that Ms. Balderson was a licensed respiratory therapist. (ECF No. 136 at 64, 70–71.)   At no time prior to Ms. Balderson's termination did Ms. Moreau verify her licensure.   (*Id.* at 65.)

Following a clinical employee's change in employment at Lincare, it was "common practice" for Ms. Moreau to conduct a review of that clinician's license, as well as a review of the applicable rules and regulations for the state in which the individual is licensed.   (*Id.* at 45.) Some states require an employer to report a change in the employees status.   (*Id.*)   Ms. Moreau is responsible for this process, which she conducts in consultation with both Lincare's legal and human resources departments.   (*Id.* at 46.)

Because Ms. Balderson had identified herself as an RRT on her badge and her business cards, Ms. Moreau reviewed the status of Ms. Balderson's license on the West Virginia Board of

Respiratory Care (the "West Virginia Board") website on June 4, 2019.   (*Id.* at 47–49.)   The West Virginia Board's website showed that Ms. Balderson's license had expired on December 31, 2018. (Def. Ex. 21.)   Ms. Moreau then checked the Ohio Board's website, which showed the aforementioned consent agreement which Ms. Balderson entered into with the Ohio Board following her failure to disclose her public intoxication charge.   (Def. Ex. 20; ECF No. 136 at 52–53.)   Ms. Moreau then investigated Ms. Balderson's employment application with Lincare, and she discovered that Ms. Balderson had not indicated that her Ohio license was the subject of any then-current disciplinary action or restrictions.   (Def. Ex. 18.)

Several weeks later, on June 17, 2019, and after consulting with Lincare's legal and human resources departments, Ms. Moreau completed a "Complaint Form" and submitted the complaint with the West Virginia Board, in which Ms. Moreau disclosed the since-expired Consent Agreement with the Ohio Board and the presumed expiration of Ms. Balderson's respiratory therapist license.   (Pl. Ex. 7; ECF No. 136 at 57–58.)

The West Virginia Board responded by letter on June 27, 2019, and there it indicated that Ms. Balderson's license was still active and that the inactive status was likely the result of an "electronic error" after Ms. Balderson completed her 2019 license renewal online.   (Pl. Ex. 8.) The letter was properly addressed to Lincare in Williamstown, West Virginia, though Ms. Moreau's home office is located in Clearwater, Florida.   (*Id.*)   The letter was also faxed to Lincare the next day.   (*Id.*)   While there is conflicting evidence as to whether Ms. Moreau ever received this letter, the letter itself was properly addressed to Lincare, and Lincare has not disputed that it received the letter.

Ms. Balderson subsequently applied for and received unemployment through WorkForce West Virginia. (*See* Pl. Ex. 10.) Ms. Balderson's claim for unemployment compensation was submitted on June 23, 2019, and the decision was issued on July 11, 2019. (*Id.*) Ms. Balderson stated to WorkForce that she had been terminated for a violation of company policy, and that she had been unaware of that policy. (*Id.*) Lincare opposed Ms. Balderson's claim and, in a letter to WorkForce, indicated that Ms. Balderson's employment had been terminated for a violation of company policy and for failing to notify Lincare that her respiratory care license had lapsed. (Pl. Ex. 12; *see also* ECF No. 135 at 78.) This letter, authored by Lincare's unemployment claims contractor, was dated July 2, 2019, which was several days following the West Virginia Board's notification to Lincare that Ms. Balderson's license had in fact not lapsed. (Pl. Ex. 12.) Lincare referenced the mistaken lapsed license again in an email on July 10, 2019. (Pl. Ex. 11.) Lincare never corrected the record before WorkForce that Ms. Balderson's license had not lapsed. (ECF No. 135 at 173.)

Ms. Balderson remained unemployed for approximately two months following her termination. (*Id.* at 74.) She was then hired at Encompass Health as a pre-admitting liaison, a position dissimilar to the sales representative position she held at Lincare. (*Id.*) At Encompass Health, Ms. Balderson engaged in marketing and meeting with patients to "write them up" and have them admitted to the hospital. (*Id.*) Ms. Balderson did receive some offers for sales positions with BioMed and Appalachian Medical, but did not follow through with the offers on account of a non-compete agreement Ms. Balderson had signed with Lincare. (*Id.* at 74–75.) Following the expiration of this non-compete, Ms. Balderson quickly found a sales representative

position at WeCare Medical, which is a very similar position to the one she held with Lincare. (*Id.* at 75–76.)

## II.  PRELIMINARY CONCLUSIONS OF LAW

The West Virginia Human Rights Act makes it unlawful "[f]or any employer to discriminate against an individual with respect to . . . tenure . . . if the individual is able and competent to perform the services required . . . ."   W. Va. Code § 5-11-9(a)(1).   "Discriminate" means "to exclude from, or fail or refuse to extend to, a person equal opportunities" based on several protected classes, including sex.   W. Va. Code § 5-11-3(h).   The West Virginia Supreme Court of Appeals has held that an employment discrimination claim under the Human Rights Act is governed by the same analytic framework of Title VII of the Civil Rights Act of 1964, as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).   *See Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152, 159 (W. Va. 1995); *Calef v. FedEx Ground Packaging Sys., Inc.*, 343 F. App'x 891, 898 (4th Cir. 2009).

Under the burden-shifting *McDonnel-Douglas* framework, the plaintiff must first establish a *prima facie* case of employment discrimination.   *See Knotts v. Grafton City Hosp.*, 786 S.E.2d 188, 194 (W. Va. 2016).   In a disparate treatment case such as this, a plaintiff may meet the initial *prima facie* standard by showing the following:

> (1) that the complainant is a member of a group protected by the Act; (2) that the complainant was discharged, or forced to resign, from employment; and (3) that a nonmember of the protected group was not disciplined, or was disciplined less severely, than the complainant, though both engaged in similar conduct.

*Barefoot*, 457 S.E.2d at 162–63 (quoting Syl. Pt. 2, *State ex rel. State of West Virginia Human Rights Comm'n v. Logan-Mingo Area Mental Health Agency, Inc.*, 329 S.E.2d 77, 79 (W. Va. 1985)).

If a plaintiff can make out these elements, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment decision.   *See Charleston Town Ctr. Co., LP v. W. Va. Human Rights Comm'n*, 688 S.E.2d 915, 920 (W. Va. 2009).   If the proffered reason is nondiscriminatory, then the plaintiff must show by a preponderance of the evidence that the articulated reason is merely pretextual.   *See Charleston Town Ctr. Co., LP*, 688 S.E.2d at 920–21.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO MS. BALDERSON'S PRIMA FACIE CASE

Ms. Balderson advances a claim of discrimination based on sex through disparate treatment.   Simply, Ms. Balderson alleges that she has been treated differently than her male co-worker, Chad Brady, despite engaging in similar conduct.   The first two elements of the *McDonnell-Douglas* framework are thus easily satisfied: Ms. Balderson is a woman, and she was discharged from her employment.   At issue here is the third element: Whether Ms. Balderson was punished more severely than a nonmember—Mr. Brady—of the protected group.

Because Ms. Balderson has based her allegations completely on the comparison with Mr. Brady, she is required to show that Mr. Brady, her comparator, is similarly situated to her. *Haywood v. Locke*, 387 Fed. App'x 355, 359 (4th Cir. 2010).   Ms. Balderson must show that Mr. Brady is similar to her "in all relevant respects."  *Id.   See also Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1224 (11th Cir. 2019) ("[A] plaintiff must show that she and her comparators are 'similarly situated in all material respects.'"); *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) ("There must be sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination.");

*Molloy v. Blanchard*, 115 F.3d 86, 91 (1st Cir. 1997) ("The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.").

Applying this standard to this matter, the Court finds that Mr. Brady is an appropriate comparator to Ms. Balderson under these circumstances. Their relevant conduct is nearly indistinguishable. Ms. Balderson and Mr. Brady both provided language to physicians that, if true, would be sufficient to ensure insurance payments for ventilator orders. (ECF No. 135 at 26, 28, 62.) Lincare's attempt to distinguish the two by characterizing Mr. Brady's conduct as providing "examples" is merely semantics. Indeed, Mr. Brady acknowledged that while he never intended physicians to use his example language as a "word-for-word copy/paste" template, he never told the offices *not* to do so and admitted that the understanding between him and the physicians was to "use this language." (*Id.* at 26–27.) Mr. Brady would also send the same language Ms. Balderson used to physicians when Ms. Balderson was not in the office and would provide her with the confirmation afterwards. (*Id.* at 72–73.)

Furthermore, while Mr. Brady was Ms. Balderson's immediate supervisor, in the context of these actions Mr. Brady was similarly situated. Lincare is a national company with locations in 48 states, and Mr. Brady was only one step removed from Ms. Balderson. (Def. Ex. 3 at 2; ECF No. 135 at 76.) Mr. Brady acknowledged that he viewed Ms. Balderson as a "co-worker," and that their duties would overlap. (ECF No. 135 at 14.) In fact, Mr. Brady would attend office visits with Ms. Balderson and field calls from physicians trying to order ventilators. (ECF No. 135 at 15–16.) Mr. Brady would also accept, review, and process physician orders. (*Id.* at 16.) Logically, then, Mr. Brady was also charged with understanding insurance and billing procedures

14

and educating referral sources as to the same.   (*Id.* at 26.)   Additionally, Mr. Brady was subject

to the very same corporate compliance policies as Ms. Balderson.   (Pl. Exs. 14–15; ECF No. 135

at 17.)   Finally, though Mr. Brady's final written warning was signed by Lincare's Area Manager,

Bob Scott, Ms. Pedersen was the decision-maker for Mr. Brady's discipline, just as she was for

Ms. Balderson.   (ECF No. 135 at 159.)

Thus, while their job titles and overall qualifications may have differed, Mr. Brady and Ms.

Balderson were similarly situated because the conduct each was disciplined for was nigh

indistinguishable, they were subject to the same corporate policies, and both were disciplined by

the same decision-maker, Ms. Pedersen.   Yet, despite their similarities, Mr. Brady only received

a written warning, while Ms. Balderson was discharged outright.   Therefore, for the foregoing

reasons, the Court finds by a preponderance of the evidence that Ms. Balderson has proved her

*prima facie* case of gender discrimination based on disparate treatment.   The Court thus proceeds

to the remaining prongs of the *McDonnell-Douglas* framework.

### IV. FINDINGS OF FACT AND CONLUSIONS OF LAW AS TO LINCARE'S LEGITIMATE, NON-DISCRIMINATORY REASON FOR DISCHARGE AND PRETEXT

Lincare has articulated a legitimate, non-discriminatory reason for Ms. Balderson's

discharge from employment: Violation of Lincare's Compliance Program.   (*See* Pl. Ex. 26 at 6.)

However, due to Lincare's shifting explanations and its own inconsistent practices, the Court finds

that Lincare's explanation is simply not credible.

Under Fourth Circuit standards, an employer seeking to rebut a *prima facie* showing of

discrimination is not required to persuade the court that "the proffered reason was the actual

motivation for [the] decision."   *Mereish v. Walker*, 359 F.3d 330, 335 (4th Cir. 2006).   Instead,

the employer must merely articulate a justification that is legally sufficient to justify a judgment

in his favor.  *Id.*   Further, a court may not substitute its business judgment for that of the defendant where there is no discrimination, even where it believes a decision was unfair or harsh. *See, e.g.*, *Skaggs v. Elk Run Coal Co.*, 479 S.E.2d 561, 589 (W. Va. 1996) ("Employers retain the right to restructure jobs and exercise business judgment, including even bad judgment. Employees can be let go for any reason or for no reason, provided that the reason is not a prohibited one.").

Having established a legitimate, non-discriminatory reason for the adverse employment action, the burden under *McDonnell-Douglas* again shifts to the plaintiff to show pretext.   To demonstrate pretext a plaintiff must show "by a preponderance of the evidence that the legitimate reasons offered by a defendant were not its true reasons, but were a pretext for discrimination." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007).   "Pretext" as it relates to unlawful discriminatory employment practices "means an ostensible reason or motive assigned as a color or cover for the real reason or motive, or false appearance, or pretense."   *Mayflower Vehicle Systems, Inc. v. Cheeks*, 629 S.E.2d 762, 773 (W. Va. 2006).

The Court finds, by a preponderance of the evidence, that Lincare's explanation is not credible.   First, over the course of this litigation and the events therein that form its basis, Lincare has shifted its justification, serving to undermine its stated reason for termination.   Lincare informed Ms. Balderson on the day of her termination and in the immediate months following that her employment was terminated for "leading" physicians.   (ECF No. 135 at 22, 58; Pl. Ex. 26 at 5–6.)   Misrepresenting a diagnosis or falsifying documents were not mentioned until much later in this action.[4]   (*See* ECF No. 84–1 at 3.)   This "misrepresentation" came to be based on the fax

---

[4] In relation to this accusation, Lincare also seems to imply that Ms. Balderson intentionally and fraudulently made this misrepresentation to, presumably, boost her earned commission.   (*See* ECF No. 141 at ¶ 56.)   However, and as explained above, there has been no evidence presented that would support this conclusion.   Ms. Balderson did not make the diagnosis, did not author the note in question, did not ask the physician to otherwise alter the diagnosis, and

cover sheet included with the at-issue progress note, in which Ms. Balderson indicated that the physician's order was lacking necessary information which would be necessary to successfully complete the order.   (*See* Pl. Ex. 6.)

This assertion of misrepresentation seems to originate with Ms. Pedersen, a lay witness, and she based this conclusion on a contradiction in the patient file.   (ECF No. 135 at 164.)   Ms. Pedersen is not a physician nor a respiratory therapist.   (*Id.* at 190.)   Conversely, Ms. Balderson, a registered respiratory therapist, offered a credible explanation why the note was not conflicting with the information that was found in the patient's file and that none of the information she provided was substantive to the diagnosis.   (*Id.* at 68–72.)   Lincare has not offered any evidence that the physician's diagnosis or order was incorrect or improper, and it also has not offered any evidence that anyone—physician, staff, or Ms. Balderson—set out to commit healthcare fraud. Rather than engage in this conjecture, the Court finds Occam's razor to be the most applicable principle: The purpose of the fax was simply to help a trusted physician complete a presumptively valid order.

Next, the Court finds that Lincare's assertions that Ms. Balderson *could* have violated or actually did violate various healthcare laws with a misrepresentation of a patient's diagnosis is belied by its failure to report her conduct to the United States Department of Health and Human Services's Office of the Inspector General ("OIG").   Its failure to do so further lends support that Lincare's stated reason for termination is pretextual.

---

there has been no evidence of any evil intent of Ms. Balderson.   (ECF No. 135 at 60–61.)   The evidence instead would tend to show that a doctor submitted an incomplete order, and Ms. Balderson relayed back what information was still needed to complete the order.   (*See id.* at 67.)

Lincare entered into a Corporate Integrity Agreement ("CIA") with the OIG, as well as a Settlement Agreement, contemporaneously.  (Pl. Ex. 1 at 1.)  Pursuant to the CIA, Lincare was obliged to report all conduct "that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program."  (*Id.* at 11–12; ECF No. 135 at 167.)  A "reportable event," as defined above, could be an isolated event or a series of occurrences.  (Pl. Ex. 1 at 12.)  Notably, Lincare includes in both its Code of Conduct and compliance training specific instances of conduct which would violate the False Claims Act, including "submitting a claim containing information known at the time to be false," "misrepresenting a diagnosis for the patient to justify the services or equipment furnished," and "manipulating the patient's diagnosis in an attempt to receive improper payment."  (Pl. Ex. 15 at 3; Pl. Ex. 16 at 1.)  The elicited testimony from Lincare representatives at trial indicate that they believed that Ms. Balderson engaged in this exact conduct, but Lincare never reported these actual or suspected violations to the OIG.  (ECF No. 135 at 168–69.)  Lincare's failure to report Ms. Balderson's conduct logically means it either breached its agreement with OIG or that Lincare did not genuinely believe that Ms. Balderson misrepresented a patient diagnosis, submitted false information, or otherwise committed an act of fraud.  Considering all the circumstances, the evidence would indicate the latter.

This is supported by Ms. Pedersen's attempts to justify the failure to report.  Particularly, as Lincare's 30(b)(6) deposition witness, Ms. Pedersen testified as follows:

Q:      Going back looking at the [compliance program] in front of you, can you point to the provision that Ms. Balderson supposedly violated?

A:      Yeah.  On Bates stamp number 1153, she violated misrepresenting a diagnosis for a patient to justify the services or equipment furnished,

potentially billing for non-covered equipment or services as covered equipment or services, potentially –

Q:   I'm sorry, which one's that?

A:   It's the very last bullet point under examples of false claims act.

\*\*\*

Q:   Now, you highlighted a few examples in the document in front of you.   Dis she actually violate these provisions?

A:   The investigation that was done confirmed that she definitely violated misrepresenting a diagnosis for a patient to justify the services or equipment furnished.   I would have to go back and look at all the claims that were involved to see if they were actually filed and paid.   If they were, it would[5] have been an actual violation of the others.

(ECF No. 84–1 at 3.)   Ms. Pedersen continued:

Q:   So with respect to the compliance program, have we discussed all the potential or actual violations Ms. Balderson was terminated for?

A:   She misrepresented, I believe we have – she misrepresented diagnosis to justify payment for a patient.   And she falsified a record, and for claims that may have been billed and subsequently refunded.   She violated the other pieces of the false claims act, and she definitely violated the anti-kickback statute by providing a service that should have been provided by the physician's staff.[6]

(*Id.* at 4.)   Ms. Pedersen stated at trial that she amended this testimony because she belatedly "realized we moved from talking about examples to talking about the statute."   (ECF No. 135 at 166.)   The "examples" she referred to are the examples listed in Lincare's Code of Conduct, which

---

[5] By use of the errata sheet, Ms. Pedersen claimed that she had meant to say "could" instead of "would."   (ECF No. 94–7 at 7.)

[6] By use of the errata sheet, Ms. Pedersen claimed that she had meant to say "She violated other pieces *of Lincare's published examples of potential violations of* the false claims act, and she violated *Lincare's published examples of potential violations of* the anti-kickback statute by providing . . . ."   (ECF No. 97–4 at 7 (changes in italics).)

19

specifically identifies these instances as actual violations of both the Anti-Kickback Statute and the False Claims Act.   (Pl. Ex. 15 at 2–3.)   The Court does not speculate on whether these actions actually do violate these specific statutes, but it is cognizant that Ms. Pedersen's role as the Chief Compliance Officer changes the perception of this testimony.   As the Chief Compliance Officer for Lincare, Ms. Pedersen is charged with "ensuring compliance with Lincare policies," "as it relates to healthcare compliance."   (ECF No. 135 at 144.)   Furthermore, Ms. Pedersen acknowledged that "Lincare's compliance program is designed to protect the company from violation of the healthcare laws."   (*Id.* at 144–45.)   Indeed, even Lincare's training modules identify these behaviors as violations of their associated laws.   (Pl. Ex. 16.)   Therefore, it seems implausible to the Court that the very person charged with ensuring compliance with these programs would not know whether a certain action violates a specific law, especially when considering that the compliance programs are tailored to protect Lincare from violations of these specific healthcare laws.

Indeed, even if the Court were to take Ms. Pedersen's testimony at face value, then it becomes apparent that as the Chief Compliance Officer, she was faced with actions that could reasonably be violations of healthcare laws.   Thus, pursuant to the CIA, Ms. Pedersen and Lincare were obligated to report this conduct to the OIG.   The conduct was not reported.

But all of this dovetails with what the Court believes to be the critical factor: The discipline of Mr. Chad Brady.   Ms. Pedersen testified that she was ultimately the decision-maker who handed down Mr. Brady's final written warning.   (ECF No. 135 at 159–60.)   Mr. Brady was disciplined for providing a physician "coaching or leading information[,]" through the creation and distribution of his "Good Chart Notes."   (Def. Ex. 17.)   This is the exact same reason for

which Ms. Balderson was originally terminated during the face-to-face meeting with the Lincare team on June 3.   But, that is not all that Mr. Brady was disciplined for.   His written warning continues: "It was also determined that you provided free equipment."   (*Id.*)

The giving of free equipment is similarly prohibited by Lincare's Compliance Program and Code of Conduct.   (Pl. Ex. 15 at 2.)   Specifically, the Compliance Program states that the "giving [of] valuable property, equipment, services, gifts or other benefits to a person in exchange for the referral of patients to [Lincare]," is an example of a violation of the Anti-Kickback Statute.   (*Id.*)   Similarly, Lincare's training modules also identify the providing of free equipment as a violation of the Anti-Kickback Statute.   (Pl. Ex. 16 at 13.)

Thus, Mr. Brady received less discipline despite engaging in conduct that was at least comparable to Ms. Balderson's own conduct, and in fact appears to have gone further by providing free equipment.   Interestingly, however, Ms. Pedersen testified that Lincare's internal audit had revealed no problems with the "good chart notes" Mr. Brady was using, a fact directly contradicted by his own written warning.   (ECF No. 135 at 178.)   More problematic, however, is that Ms. Moreau confirmed that there were substantial similarities in the actual patient files when compared to Mr. Brady's "good chart notes," after she had reviewed those files as a part of the audit.   (ECF No. 136 at 75.)   This certainly begs the question then as to why Mr. Brady was not terminated alongside Ms. Balderson for this strikingly similar occurrence.

This is even more prominent when one considers that Ms. Pedersen testified that "Lincare has a zero tolerance policy for compliance violations[.]"   (ECF No. 135 at 174.)   Despite this "zero tolerance" policy, Ms. Pedersen backtracked to state that she retained discretion in disciplinary matters and that "zero tolerance" only means the severity of the discipline can differ.

21

(*Id.* at 191.)   The Court is not convinced that a "zero tolerance policy" can entitle one person to multiple strikes and another to only one strike for the same conduct.[7]   In truth, the only difference between Mr. Brady's situation and Ms. Balderson's is that Mr. Brady is male and that Ms. Balderson is female.

For these reasons, the Court finds by a preponderance of the evidence that Lincare's stated reason for Ms. Balderson's discharge from employment is merely pretextual.

## V.  FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO THE ULTIMATE QUESTION OF DISCRIMINATION

Ms. Balderson has proved a *prima facie* case of disparate treatment and discrimination. Because it finds Lincare's proffered reason for termination was pretextual, the Court may infer the ultimate fact of sex discrimination.   *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993) ("rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination . . . upon such rejection, '[n]o additional proof of discrimination is required'") (emphasis in original); *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir.1995) (distilling the principles in *St. Mary's* to explain that a fact-finder that rejects a defendant's proffered reasons is not compelled to find for the plaintiff, but may find discrimination solely based on the finding that the proffered reason was false).

---

[7] The Court is similarly unpersuaded by Lincare's mystery male character who was fired for cloned notes in "pretty close proximity to when Ms. Balderson was discharged."  (ECF No. 135 at 187.)   This vague assertion with absolutely no detail gives no basis a reasonable trier of fact could use to compare to Ms. Balderson's scenario.   No age, name, location, or really any factual basis for this termination is located anywhere in the record, and coupled with the inconsistencies identified above, the Court sincerely questions whether this mystery male ex-employee actually exists.

22

Having considered the testimony and exhibits presented at trial and being fully apprised of the parties' respective positions, the Court finds by a preponderance of the evidence that the disparate treatment between Ms. Balderson and Mr. Brady was a result of discriminatory animus. Because the Court finds that Ms. Balderson's termination was the result of discriminatory animus, the Court next addresses her claimed damages.

### VI. FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO COMPENSATORY DAMAGES

Because Ms. Balderson proved her termination was the result of unlawful discrimination under the HRA, the Court may award back pay, front pay, emotional damages, punitive damages, and reasonable attorneys' fees and expenses. *See* W. Va. Code § 5-11-13(c) (authorizing compensatory damages and attorneys' fees and expenses); *Haynes v. Rhone-Poulenc, Inc.*, 521 S.E.2d 331 (W. Va. 1999) (providing that punitive damages are available in Human Rights Act cases); *Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC*, 547 S.E.2d 256 (W. Va. 2001) (providing for both punitive damages and emotional damages in employment cases).

"An injured party must generally prove resulting damages with reasonable certainty." *Bunner v. United States*, No. 6:13-CV-20655, 2016 WL 1261151 at *13 (S.D. W. Va. Mar. 30, 2016). Mathematical certainty, however, is not required. *Id.* "The party seeking to reduce the amount of damages shown to a reasonable certainty has the burden of producing evidence to show the proper reduction." *Id.* (citing *Barnes v. United States*, 685 F.2d 66, 69 (3d Cir. 1982)) (internal quotation omitted).

### A. Lost Wage Damages

At trial, Ms. Balderson called Dr. Clifford Hawley ("Dr. Hawley"), an expert in the field of economic loss, to opine on Ms. Balderson's economic losses resulting from her termination.

(ECF No. 136 at 4.)   Prior to trial, Lincare moved to exclude Dr. Hawley's testimony, but this Court denied the motion.   (ECF No. 135 at 4–5.)   Lincare did not present its own expert witness or any expert evidence in opposition to Dr. Hawley's opinions.

First, Dr. Hawley presented his opinion on Ms. Balderson's back pay damages.   "Back pay" represents the lost wages and benefits accrued from the date of termination through the date of trial.   *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417–19 (1975) (discussing the "self-correction" and "make whole" purposes of back pay in Title VII cases).   Dr. Hawley calculated Ms. Balderson's back pay from June 3, 2019, the date of termination, to October 28, 2020, the conclusion of the trial.   Dr. Hawley concluded, with a reasonable degree of scientific certainty, that the back pay amount totaled $72,080.00.   (ECF No. 136 at 5–6.)

Next, Dr. Hawley provided his expert opinion regarding front pay damages.   "Front pay" is money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement.   *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). Dr. Hawley calculated these losses accruing from the time of trial to various points in the future and reduced to present value, as follows:

```
FRONT PAY & BEN:

   (in pres. value)

        1 yr          $38,574

        2 yrs         $76,766

        3 yrs        $114,580

        4 yrs        $152,020

        5 yrs        $189,088

        6 yrs        $225,790

        7 yrs        $262,129

        8 yrs        $298,107

        9 yrs        $333,730

       10 yrs        $369,000
```

(Pl. Ex. 32; ECF No. 136 at 15–16 (admitting demonstrative exhibit into evidence in lieu of testimony on each year of front pay damages).)

However, while Lincare did not present its own expert witness, Lincare did assert the defense of after-acquired evidence.   "After-acquired evidence" is evidence of wrongdoing by the plaintiff employee "which the defendant employer discovered after it terminated the plaintiff employee," where the wrongdoing would have justified her termination.   *Barlow v. Hester Industries, Inc.*, 479 S.E.2d 628, 642 (W. Va. 1996).   This after-acquired evidence is admissible in an employment discrimination action, but only for the "limited purpose of determining the remedies available to the plaintiff employee."   *Id.* at 643.

"Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 363 (1995).   *See also Russell*

*v. Microdyne Corp.*, 65 F.3d 1229, 1240 (4th Cir. 1995) (recognizing the "emphasis on the need for serious wrongdoing" in light of *McKennon*).   Once an employer establishes the severity of the misconduct, "[t]he 'general rule' . . . is that neither reinstatement nor front pay is an appropriate remedy."   *Id.* at 1239 (internal quotation omitted).   Therefore, "[t]he beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered."   *Id.*

The evidence at issue here is Ms. Balderson's application for employment with Lincare, on which she disclosed her Ohio and West Virginia respiratory care licenses.   (Pl. Ex. 19.) Despite entering into a consent agreement with the Ohio Board that established a one-year probation period that was in effect on the date of her application, Ms. Balderson indicated that neither license was the subject of current disciplinary action.   (*Id.*; *see also* Def. Ex. 20.)

At the time of the investigation, Ms. Moreau was unaware that Ms. Balderson was a licensed respiratory therapist.   (ECF No. 136 at 64, 70–71.)   Following Ms. Balderson's termination of employment, and as explained above, Ms. Moreau began investigating Ms. Balderson's license status, as was Lincare's routine following an employee's termination.   This subsequent investigation led to the discovery of the aforementioned erroneous lapsed license in West Virginia and the Ohio Board's consent agreement.   (*Id.* at 47–49.)   Ms. Moreau's investigation also compelled her to examine Ms. Balderson's original application for employment, where she discovered that Ms. Balderson had not disclosed the Ohio Board's consent agreement establishing the one-year probationary period.   (*See* Def. Ex. 18.)   Ms. Moreau made this discovery on June 4, one day following Ms. Balderson's discharge.

26

At trial, Andrea Daggett ("Ms. Daggett"), Lincare's Employment Relations Manager, testified that Ms. Balderson's omission regarding the disciplinary action negatively impacted Ms. Balderson's credibility.  (ECF No. 135 at 194.)  Ms. Daggett further testified that while a respiratory therapist license is not required for sales representatives,[8] the omission still affected Ms. Balderson's integrity.  (*Id.* at 196.)  As to operations, Ms. Daggett testified that Ms. Balderson's omission would logically lead one to question her integrity as to "specificity of appropriately completing documents, thoroughly providing thorough and complete information, fact-based information."  (*Id.* at 196.)  Ms. Daggett stated that had Ms. Balderson's omission or "falsification" been known at the time she was an employee, it would have led to her immediate termination.  (*Id.*)  Similarly, Ms. Moreau testified that, upon her discovery of the omission on Ms. Balderson's application, it caused her to question whether Ms. Balderson had provided accurate information.  (ECF No. 136 at 55.)  Indeed, Ms. Moreau testified that she concluded that Ms. Balderson had provided "false information" on her application for employment, and she reviewed and consulted with Lincare's human resources personnel and attorneys regarding these findings.  (*Id.* at 56.)  Even Ms. Balderson herself admitted, on cross-examination, that "any misrepresentation, or omission, or untruth could be grounds for discharge[.]"  (ECF No. 135 at 88.)

The Court finds that the record supports Lincare's asserted after-acquired evidence defense.  Information obtained after Ms. Balderon's termination caused Ms. Moreau to review Ms. Balderson's application to Lincare, where she found that Ms. Balderson had omitted that her

---

[8] While the license was not a requirement for Ms. Balderson's position as a sales representative, Ms. Daggett testified that Ms. Balderson "did perform one or two clinical set-ups," which would have required her to have a license.  (ECF No. 135 at 201–02.)

Ohio license was not subject to discipline or restriction, when in fact it was.   Ms. Daggett testified that this omission was a terminable offense, and her testimony is further supported by Ms. Moreau's conclusion and subsequent consultation with Lincare's human resources personnel and attorneys.   Ms. Moreau's discovery of this evidence occurred on June 4, 2019, only one day following Ms. Balderson's termination from employment.   Therefore, as to lost wages, Ms. Balderson is entitled to recover back pay for one day in the amount of $141.00, for the time from her discharge on June 3, 2019, to the discovery of the after-acquired evidence on June 4, 2019. As a result of the discovery of the after-acquired evidence, Ms. Balderson is not entitled to front pay or to reinstatement.

### B.   Emotional Damages

Next, the Court considers Ms. Balderson's claim of $50,000 in emotional damages.   At trial, Ms. Balderson testified that following her termination, she had trouble sleeping and sought medical help for anxiety.   (ECF No. 135 at 79–80.)   She further claimed that her hair had fallen out due to stress and emotional breakdowns.   (*Id.* at 80, 82.)   Ms. Balderson also testified that the loss of her position with Lincare caused her family to not be able to afford certain activities in competitive baseball and cheerleading, in which her two children were active.   (*Id.* at 78–79.) Finally, Ms. Balderson testified that the experience was embarrassing and that she felt like people did not trust her any longer or looked at her differently.   (*Id.* at 80.)   Lincare did not offer any evidence contrary to Ms. Balderson's claims.

"[A] plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress . . . however, the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated."   *Price v. City of*

*Charlotte, N.C.*, 93 F.3d 1241, 1254 (4th Cir. 1996) (applied in the context of civil rights).[9]   "A plaintiff seeking compensatory damages for emotional distress cannot rely on conclusory statements that the plaintiff suffered emotional distress [or] the mere fact that a constitutional violation occurred but, rather, the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated."   *Knussman v. Maryland*, 272 F.3d 625, 640 (4th Cir. 2001).

Here, Ms. Balderson's evidence of emotional distress consists largely of her own statements.   However, Ms. Balderson has sufficiently articulated that she suffered from anxiety, embarrassment, and financial loss resulting from her termination from employment with Lincare. In particular, Ms. Balderson established that she sought treatment for anxiety; suffered from hair loss caused by the stress of her termination; and that the financial losses stemming from her termination directly affected her family's enjoyment of activities.   Moreover, she has sufficiently connected these injuries to her termination.   Still, much of Ms. Balderson's testimony is uncorroborated, and the Court believes an appropriate reduction of the claimed damages is proper. Therefore, and finding it appropriate to do so, Ms. Balderson is entitled to recover $30,000.00 in emotional damages.   *See Mace v. Charleston Area Medical Center Foundation, Inc.*, 422 S.E.2d 624, 634 (W. Va. 1992) (refusing to vacate award of emotional damages despite the "paucity of evidence").

### C.  Punitive Damages

West Virginia Code § 55-7-29(a) provides that "[a]n award of punitive damages may only occur in a civil action against a defendant if a plaintiff establishes by clear and convincing evidence

---

[9] "The prerequisites for recovering damages for emotional distress in Title VII cases are essentially the same as in federal civil rights cases."   *LaPorte v. Henderson*, 176 F.Supp.2d 464, 471 (D. Md. 2001).

that the damages suffered were the result of the conduct that was carried out by the defendant with actual malice toward the plaintiff or a conscious, reckless and outrageous indifference to the health, safety and welfare of others."   Where a plaintiff succeeds in showing actual malice, "[t]he amount of punitive damages that may be awarded . . . may not exceed the greater of four times the amount of compensatory damages or $500,000, whichever is greater."   W. Va. Code § 55-7-29(c).

> Although published before the enactment of West Virginia Code § 55-7-29(a), the West Virginia Supreme Court has previously provided guidance as to when punitive damages are available to a plaintiff.   Under West Virginia law, punitive damages are not appropriate in cases of "simple negligence," . . . but are instead reserved for "actions of tort [ ] where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear[.]"

*Billings v. Lowe's Home Centers, LLC*, Civ. Action No. 2:18-cv-00039, 2019 WL 1869936 at *5 (S.D. W. Va. Apr. 24, 2019) (Copenhaver, J.) (quoting *Alkire v. First Nat'l Bank of Parsons*, 475 S.E.2d 122, 129 (W. Va. 1996)) (internal citations omitted).   "'Actual malice' may be found where [the defendant] acted with a state of mind shown by conduct that was intended to or was substantially certain to injure [the plaintiff], without any just cause or excuse."   W.V. Pattern Jury Instr. Civil. § 1500.

In this instance, the Court finds that there is clear and convincing evidence of malice such that an award of punitive damages is appropriate.   First and most egregiously, Lincare initiated what can only be described as a vindictive and retributive investigation into Ms. Balderson's licensure status.   Despite identifying herself as a licensed respiratory therapist on her application for employment, her Lincare identification badge, and her business cards, Lincare never once verified her licensure status while Ms. Balderson was actually employed.   (ECF No. 135 at 201; ECF No. 136 at 65.)   Yet, following her termination, Lincare not only investigated her licensure

status for several weeks, but also reported erroneous information to the West Virginia Board.   (Pl. Ex. 7.)   While true that the information displayed by the West Virginia Boards's website was incorrect, Lincare's "investigation" utterly failed to thoroughly and accurately uncover factual information relating to its erroneous findings.   For example, despite spending weeks investigating Ms. Balderson's license, Ms. Moreau never called Ms. Balderson to determine whether she was aware of any issue with her status, a process Ms. Moreau herself testified would only take 15 minutes.   (ECF No. 136 at 60.)   She similarly did not call Mr. Brady, with whom Ms. Balderson was close to both personally and professionally, to see if he had any information concerning Ms. Balderson's licensure status.   (*Id.* at 60–61.)   Surely, one 15-minute phone call to either would have prevented the continued mean-spiritedness that followed.

Lincare's vindictiveness is only further amplified with the other notice it included on its complaint to the West Virginia Board: "It has also come to our attention that Ms. Balderson entered into a Consent Agreement with the Ohio Respiratory Care Board April 22, 2015."   (Pl's Ex. 7.) At the outset, this information was completely irrelevant to her West Virginia license's apparent expiration.   But it is also noteworthy that at the time Lincare submitted this complaint to the West Virginia Board, on June 17, 2019, the Consent Agreement itself had expired over three years prior with no further disciplinary actions taken.   (Pl. Ex. 20.)   While Ms. Moreau stated that "some states," like "California," require employers to report a change in employment with a clinically licensed employee, (ECF No. 136 at 45), she was not able to identify any duty required by West Virginia as it related to Ms. Balderson.   (*Id.* at 64–65.)   In fact, Ms. Moreau acknowledged that Ms. Balderson was not a clinical employee at Lincare.   (*Id.*)   Instead, Lincare's asserted reason for the inclusion of its "discovery" of the expired Consent Agreement was that it was "potentially

being professional misconduct" rings as a hollow excuse to cover its malice in continuing to punish Ms. Balderson by instigating a formal inquiry into her West Virginia license.   (*Id.* at 67.)

Lincare also failed to correct or retract this complaint when it came into knowledge that Ms. Balderson's license had not in fact expired.   The West Virginia Board responded to Lincare's complaint, wherein it acknowledged that the website had displayed the incorrect information.   (Pl. Ex. 8.)   Ms. Moreau never saw the West Virginia Board's response until the initiation of this litigation, but she admitted that she had learned the information was incorrect by August 10, 2019, and did not take any action with the complaint.   (ECF No. 136 at 69.)   While Lincare disputes whether Ms. Moreau ever saw this response, the letter was properly addressed to Lincare's Parkersburg center, and Lincare has not put forth any evidence, convincing or otherwise, that no one saw the letter.   Regardless, and as evidenced, even when it did realize the error, it still took no action to correct or withdraw the complaint to the West Virginia Board.

Indeed, the evidence shows that Lincare continued this fight by contesting Ms. Balderson's unemployment claim by asserting that Ms. Balderson had been terminated, at least in part, because "[s]he failed to notify Respiratory license lapsed."   (Pl. Ex. 12.)   Lincare's letter noting its reasoning for its contest of benefits was dated July 2, 2019, which came after the West Virginia's Board June 27 response.   (*Id.*)   On July 10, Lincare again asserted that Ms. Balderson "had been holding herself out to the Company and the Company's referral sources as a licensed respiratory therapist, when she was no longer licensed."   (Pl. Ex. 11.)   Lincare never corrected the record before Workforce West Virginia.   (ECF No. 135 at 173–74.)   A complete and thorough investigation should have revealed that Lincare was incorrect in these assertions.   Yet Lincare's rush to "pile on" only serves to underscore the utter disregard and vengefulness Lincare

32

demonstrated towards Ms. Balderson.   Therefore, based on the foregoing, the Court finds that Ms. Balderson has proved by clear and convincing evidence that Lincare acted with actual malice toward her.

The Court is unpersuaded by Lincare's assertion that its actions following Ms. Balderson's termination have no bearing on whether punitive damages can be awarded simply for the fact that they occurred after Ms. Balderson's termination.[10]   (ECF No. 141 at ¶ MMM.)   Lincare has offered no legal support for this claim, and indeed, the bulk of precedent appears to show that a former employee is still protected from continuing acts of discrimination.   *See Passer v. American Chemical Soc*, 935 F.2d 322, 330–31 (D.C. Cir. 1991) ("Although the statute bars retaliation only against 'employees or applicants for employment,' 29 U.S.C. § 623(d), '[t]he term "employee" ... [has been] interpreted broadly: it includes a former employee as long as the alleged discrimination is related to or arises out of the employment relationship.'") (collecting cases).   *See also Hashimoto v. Dalton*, 118 F.3d 671, 675 (9th Cir. 1997) ("A plaintiff may seek relief for retaliatory actions taken after her employment ends if the alleged discrimination is related to or arises out of the employment relationship.").   The temporal proximity between Ms. Balderson's discharge from employment and Ms. Moreau's investigation inextricably ties the actions together, which Lincare continued to pursue over the entire summer of 2019.

Based on the foregoing, the Court finds by clear and convincing evidence that punitive damages are warranted.   Under West Virginia law, "[t]he amount of punitive damages that may be awarded in a civil action may not exceed the greater of four times the amount of compensatory

---

[10] Lincare also appears to rely on an outdates legal standard of "criminal indifference," which had been articulated by the West Virginia Supreme Court prior to the enactment of W. Va. Code § 55-7-29 in 2015.   (*See* ECF No. 141 at ¶¶ JJJ–LLL.)   Because W. Va. Code § 55-7-29 provides the appropriate legal standard to be applied, Lincare's argument is rejected.

damages or $500,000, whichever is greater." W. Va. Code § 55-7-29. With these limits in mind, the Court awards Ms. Balderson punitive damages in the amount of $120,000.

### D.  Attorneys' Fees and Costs

Because Ms. Balderson has prevailed on her West Virginia Human Rights Act claim, the Court may award her reasonable attorneys' fees and expenses.  *See* W. Va. Code § 5-11-13.   Ms. Balderson is directed to submit for the Court's review a claim for reasonable attorneys' fees and expenses within 14 days from entry of this Order.   Lincare shall file any response within 14 days of Ms. Balderson's submission.   Ms. Balderson may then file a reply within 7 days of Lincare's response.

### VII.     JUDGMENT

For the reasons stated herein, the Court enters judgment against Lincare in the amount of $150,000.00, plus one day back pay in the amount of $141.00, plus attorneys' fees and expenses.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:       June 7, 2021

THOMAS E. JOHNSTON, CHIEF JUDGE